**Norman J. MULHOLLAND**

v.

**The UNITED STATES.**

**No. 4–63.**

United States Court of Claims.

May 13, 1966.

Donald R. Wellford, Memphis, Tenn., for plaintiff. McCloy, Wellford & Clark, Memphis, Tenn., of counsel.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to Rule 57(a) to Trial Commissioner Mastin G. White, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 19, 1965. Exceptions to

the commissioner's report were filed by the plaintiff, briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover on the claim, defendant is not entitled to recover on the counterclaim, and the petition and counterclaim are dismissed.

Commissioner White's opinion, as modified by the court is as follows:

## INTRODUCTION

The plaintiff, Norman J. Mulholland, is the trustee in bankruptcy of Pacific Grape Products Company, a bankrupt California corporation. At the time when it was actively engaged in business, Pacific Grape Products Company was a processor of fruits and vegetables, and maintained its place of business in Modesto, California.

According to the petition in the present action, the plaintiff trustee in bankruptcy seeks "recovery of amounts due the plaintiff by reason of the defendant's breach of a written contract between the United States and the bankrupt corporation * * *."[1]

The contract mentioned in the petition was entered into as of April 11, 1951, between Pacific Grape Products Company and the defendant (represented by a contracting officer of the Quartermaster Corps, U. S. Army). Under this contract, Pacific Grape Products Company undertook to furnish the labor, equipment, and storage capacity necessary for the assembly of 6,000,000 5-in-1 rations, utilizing components and packaging materials furnished by the defendant. The original contract price was $278,796, but

the price was subsequently reduced by change orders to $278,687.39. (For the sake of convenience, this contract will usually be referred to hereafter in the opinion as "the contract," and Pacific Grape Products Company will usually be referred to as "the contractor.")

The alleged breach of contract consisted of the issuance by the defendant's contracting officer on June 5, 1951, of a stop order which directed the contractor not to begin the final assembly of rations under the contract until further notice. Subsequently, the contracting officer permitted the contractor to begin the assembly of rations on or about July 16, 1951. Thereupon, the contractor promptly proceeded to perform its work under the contract. The first delivery of assembled rations to the defendant was accomplished by the contractor a few days after July 16, 1951, and the contract was completed on or about December 31, 1951.

## THE STATUTE OF LIMITATIONS

The primary question requiring detailed discussion arises from the defendant's affirmative defense to the effect that the plaintiff's claim is barred by the statute of limitations (28 U.S.C. § 2501 (1958)), which provides that:

> Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

The evidence shows that by December 31, 1951, the contractor had completed all the work required of it under the contract, and had borne all the increased costs that resulted from the issuance of the June 5, 1951, stop order. Accordingly, the right to demand payment for the increased costs vested in the contractor not later than December 31, 1951, and it must be concluded that the con-

---

[1]. Alternatively, the petition asserts that "this action is brought against the United States * * * for additional amounts due under the terms of a written contract with the United States for extra work and services performed by Pacific Grape Co. at the request of and on behalf of the defendant as a result of changes to the contract imposed by the defendant." The evidence in the record shows, however, that the bankrupt corporation performed for the Government only those services which the corporation had contracted to perform.

tractor's claim first accrued not later than that date. Battelle v. United States, 7 Ct.Cl. 297, 300 (1871); L. E. Myers Co., Inc. v. United States, 64 F.Supp. 148, 105 Ct.Cl. 459, 478 (1946); Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 142 Ct.Cl. 165 (1958).

The petition in this case was filed on January 3, 1963. Consequently, it appears that the petition was filed approximately 11 years after the plaintiff's claim first accrued, and, therefore, that the claim is barred by the 6-year statute of limitations, unless the running of that statute was tolled for some reason until January 4, 1957, or later.

In this connection, the petition charges the defendant with "deliberate concealment of the true facts and reasons for the delay and the assertion of false and irrelevant facts," and the plaintiff contends that such "a fraudulent attempt to enable the defendant to evade its responsibility for the delay and to unfairly deprive the Contractor of the recovery for the damages it sustained through such delay" was sufficient to toll the running of the statute of limitations. In support of this contention, the plaintiff has cited 34 Am.Jur Limitation of Actions § 231, pp. 188–189.

The proper evaluation of this contention by the plaintiff with respect to the tolling of the statute of limitations will require a rather extended exposition of the factual background for the issuance of the June 5, 1951, stop order.

As previously indicated, the contract covered the assembly by the contractor of 6,000,000 5-in-1 rations. Such rations are in the category of operational rations. They are designed for situations where organized messing of military personnel cannot be accomplished, but where feeding in small groups is possible. Such situations arise when radar station or weather station crews are located at isolated outposts, or when gun crews, tank crews, patrols, or similar small groups are deployed beyond the range of their unit kitchens. Field cooking equipment is desirable but not required in connection with the consumption of 5-in-1 rations.

The contract and the specifications that were incorporated in it by reference provided for the assembly by the contractor of the 5-in-1 rations on the basis of five different menus. These menus were to contain various combinations of canned meat items, canned bread or bread-type biscuits, types of pudding, types of jam, several kinds of vegetables, sugar, milk, beverages, confections, cheese spread, and butter spread. Each menu was to be packed in a separate case or carton, and was to provide five men with three meals for one day. In addition, each carton was to contain a can opener, chewing gum, cigarettes, matches, water purification tablets, toilet paper, and soap.

Five-in-1 rations are to be distinguished from C-rations, which are also operational rations. The C-ration is intended for use when the tactical situation is so unstable that not even messing in small groups is possible, and no kitchen facilities are available. This ration is packaged so that it can be carried by an individual, and it provides one individual with three meals for one day. The C-ration, like the 5-in-1 ration, is prepared in several different menus that consist of various combinations of food components (including meat items), plus cigarettes, matches, water purification tablets, and toilet items. The food items are prepared so that they may be eaten without further cooking.

The property which the defendant was obligated under the contract to furnish the contractor for use in assembling the 5-in-1 rations consisted of more than 50 varieties of canned or packaged food items (including canned meats), plus auxiliary items of the sort previously mentioned and numerous varieties of packaging materials. The defendant made arrangements with various suppliers for the procurement of the ration components and packaging materials.

The contract was one of several contracts which the defendant entered into at about the same time with various per-

sons, whereby the latter were to assemble operational rations from components furnished by the defendant. All these contracts were similar, except that some covered the assembly of 5-in-1 rations and others covered the assembly of C-rations.

Beginning as early as February 1951 and extending into the summer of 1951, there was a shortage of meat in the United States. Meat animals were in plentiful supply at the time, but many animals that otherwise would have been marketed and slaughtered during the period were withheld from market because of ceiling prices imposed by the defendant. Due to the meat shortage, the defendant experienced difficulty in obtaining from suppliers the quantities of boneless beef, carcass beef, pork, pork products, and canned meats that were needed for the feeding of the defendant's military personnel. This situation became more acute for the defendant after April 30, 1951, than it had been previously. From the standpoint of the present litigation, the most significant aspect of the meat shortage related to the inability of the defendant to obtain from its suppliers adequate quantities of certain canned meat items that the pertinent specifications prescribed for inclusion in some of the 5-in-1 ration menus and in some of the C-ration menus.

The meat shortage was first mentioned to the contractor by the defendant in a letter dated May 31, 1951, from the Chicago Quartermaster Depot, Department of the Army, which administered the defendant's contracts for the procurement of operational rations (among other things). This letter stated in part as follows:

The supply of the meat components for your Ration Assembly still has not been cleared to satisfaction. Lt. Colonel Hirschhorn, Chief of the Operational Rations Branch is in Washington, D. C., this date attending a conference to resolve the meat shortage. It is hoped that good news will be forthcoming in the near future.

Until you hear further it would be advisable to hold up hiring personnel for the purpose of commencing the 5-in-1 Ration Pack.

At about the end of May 1951, the defendant had on hand approximately 3,000,000 5-in-1 rations and approximately 19,000,000 C-rations. The Office of the Quartermaster General, Department of the Army, surveyed the situation with respect to the quantities of operational rations on hand, the prospective need for operational rations by the Armed Forces during the ensuing several weeks, and the difficulties that were being encountered in the procurement of certain canned meat items for use as components in operational rations. It was decided that, in view of the relatively stable military situation which confronted the defendant at the time, the supply of operational rations on hand was sufficient to meet any need for such rations during the next several weeks that might reasonably be anticipated, and that the further procurement of such rations should be suspended for approximately 45 days, in the hope that the shortage in the supply of certain canned meat items for use as components in operational rations would be relieved during the period of the suspension. Accordingly, the Office of the Quartermaster General sent a telegram to the Chicago Quartermaster Depot on June 2, 1951, directing that the program for the assembly of operational rations be suspended until on or about July 16, 1951.

In accordance with the instructions received from the Office of the Quartermaster General, the Chicago Quartermaster Depot sent the following telegram to the contractor on June 5, 1951:

RE CONTRACT DA 11 DASH 009 QM DASH 9458 01 12011 DASH OPR DASH 51 REQUEST THAT NO ACTION BE TAKEN TO BEGIN FINAL ASSEMBLY UNTIL FURTHER NOTICE PD SUB ASSEMBLIES CAN BE STARTED WHEN YOU DESIRE

The contractor considered the telegram of June 5, 1951, as a follow-up of the letter dated May 31, 1951. Consequently, the contractor understood that the assembly of 5-in-1 rations under the con-

tract was being suspended because of the defendant's difficulty in securing certain meat components for such rations.

Instructions similar to those contained in the telegram of June 5, 1951, to the contractor were issued by the Chicago Quartermaster Depot to the other persons that held contracts at the time for the assembly of operational rations.

On June 15, 1951, the Chicago Quartermaster Depot sent the following telegram to the contractor:

RE CONTRACT DA 11 DASH 009 QM 9458 01 12011 DASH OPR DAST 51 TENTATIVE EARLIEST STARTING DATE FOR FINAL ASSEMBLY OF RATION SMALL DETACHMENT 5 DAST IN DAST 1 IS 16 JULY 1951 THIS OFFICE WILL NOTIFY YOU IF CHANGED

The contractor began the final assembly of 5-in-1 rations under the contract on or about July 16, 1951, pursuant to the permission granted in the telegram of June 15, 1951. The first shipment of assembled rations to the defendant was made by the contractor a few days after July 16, 1951.

When the contractor began the final assembly of 5-in-1 rations on or about July 16, 1951, with the permission of the Chicago Quartermaster Depot, the contractor still did not have on hand certain of the canned meat items prescribed by the specifications for inclusion in some of the menus. The final assembly of such menus was postponed by the contractor until the proper canned meat items were received. In the meantime, beginning on or about July 16, 1951, the contractor assembled and shipped those menus for which it had on hand all the prescribed food components.

The prejudice to the contractor from being required to delay the assembly of rations under the contract until on or about July 16, 1951, is indicated in the findings. It is not necessary, however, to summarize such data for the purpose of the present discussion.

■ The defendant was not justified, and breached the contract, in requiring the contractor to delay until July 16, 1951, the assembly of ration menus for which the contractor had on hand the prescribed food components. Oliver-Finnie Co. v. United States, 279 F.2d 498, 503, 150 Ct.Cl. 189, 196 (1960).[2] On the other hand, the evidence does not support the plaintiff's allegations that there was, on the part of the defendant, "deliberate concealment of the true facts and reasons for the delay and the assertion of false and irrelevant facts," and "a fraudulent attempt to enable the defendant to evade its responsibility for the delay and to unfairly deprive the Contractor of the recovery for the damages it sustained through such delay."

■ The facts in the record show that the principal motivation behind the issuance by the Office of the Quartermaster General of its instructions to the Chicago Quartermaster Depot on June 2, 1951, that the assembly of operational rations should be suspended was the inability of the defendant to obtain adequate supplies of certain canned meat items that were prescribed by the pertinent specifications for inclusion in some of the 5-in-1 ration menus and in some of the C-ration menus. No misrepresentations were made to the contractor in the stop order of June 5, 1951, or otherwise.

■ It is true that the defendant did not at any time furnish to the contractor a full explanation of the defendant's supply situation with respect to operational rations, particularly the fact that the defendant had on hand as of the end of May and the beginning of June 1951 a supply of operational rations that was regarded as sufficient to meet the reasonably anticipated needs for such rations during the next several weeks. Surely, though, one who openly breaches a contract is not under a duty to make a full disclosure to

---

**2.** The defendant's delay in furnishing components that were in short supply did not breach the contract. See par. 35 of the general provisions, set out in finding 2(e).

the victim of every facet of the thinking behind the breach, in order to avoid a charge of fraudulent concealment sufficient to toll the statute of limitations. Furthermore, the very issuance of the stop order in this case implied that the supply of 5-in-1 rations was sufficient for the immediate future, since it was reasonable to presume that the defendant's procurement officials, as military men, would not stop the assembly of ration menus for which the prescribed components were on hand if the Armed Forces urgently needed the particular menus. Indeed, it was reasonable to presume that the procurement officials, as military men, would have authorized the substitution of other less desirable food components for the canned meat items that were unavailable for some of the menus if there had been an immediate need for the rations because of the military situation.

Everything considered, there is no justification for a finding that the defendant fraudulently made false statements to the contractor or fraudulently concealed material facts from the contractor.

 It appears, therefore, that the running of the statute of limitations was not tolled in this case by reason of any fraud on the part of the defendant.[3]

Perhaps it should also be mentioned, in connection with the question as to whether the statute of limitations was tolled, that the contractor and the defendant were involved in two sets of administrative proceedings until August 9, 1957, and July 22, 1958, respectively. Both of these dates were within the 6-year period that immediately preceded the filing of the petition on January 3, 1963.

One set of administrative proceedings was instituted by the contractor on December 19, 1951, when it submitted to the Chicago Quartermaster Depot a claim in the amount of $61,453.59 for additional expenses incurred as a result of the stop order dated June 5, 1951. The contractor's claim, as revised somewhat in July 1953 on the basis of an actual audit of the contractor's expenses, was referred by the Department of the Army to the General Accounting Office, which denied the claim in a decision dated April 13, 1954.

In a communication dated August 20, 1954, and addressed to the attention of the contracting officer, a representative of the contractor requested "that the Contractor be furnished with a final decision signed by the Contracting Officer * * * covering the entire claim, together with findings of fact covering questions of law and questions of fact." In this connection, it should be mentioned that the contract contained the standard "disputes" article which is customarily found in Government contracts and which provides that disputes concerning questions of fact which are not disposed of by agreement shall be decided by the contracting officer, subject to a right of appeal to the head of the department. The contractor's request was denied by the contracting officer in a communication to the contractor dated August 25, 1954, on the ground that there was no question of fact presented upon which the contracting officer had authority to make a decision.

The contractor thereupon took an appeal to the Armed Services Board of Contract Appeals (acting for the Secretary of the Army) from the action of the contracting officer. The appeal was denied by the ASBCA in a decision dated August 9, 1957 (ASBCA No. 3683).

 The fact that the contractor was involved in administrative proceedings until August 9, 1957, on the claim that is involved in the present litigation did not toll the running of the statute of limitations. The authority of the administrative agency to render decisions under the "disputes" provision of the contract was limited by the language of

---

3. As the court held earlier in this case, 165 Ct.Cl. 231, 233 (1964), proof of such fraud would have tolled the statute of limitations. See Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Westinghouse Electric Corp. v. Pacific Gas & Electric Co., 326 F.2d 575 (C.A.9, 1964).

that provision to "question[s] of fact arising under this contract" and related to matters as to which the administrative authorities could grant relief under the contract. What occurred here was a breach of the contract, not an authorized stop order under the contract (which contained no suspension of work clause). Oliver-Finnie Co. v. United States, supra. Consequently, since the institution and prosecution of administrative proceedings relative to a claim based upon an alleged breach of contract could not be regarded as a prerequisite to the maintenance of a legal action on the same claim, such proceedings did not toll the statute of limitations. Thomas v. United States, 125 Ct.Cl. 76, 79–80 (1953); Art Center School v. United States, 142 F. Supp. 916, 921, 136 Ct.Cl. 218, 226 (1956).

Concurrently with the administrative proceedings previously mentioned, an affirmative claim of the defendant against the contractor was being processed under the "disputes" provision of the contract. That claim was originated by the contracting officer's findings of fact and decision which were forwarded to the contractor on August 26, 1953, and which demanded payment of $158,936.11, representing costs to the defendant arising from the infestation of certain food components furnished by the defendant and in the custody of the contractor. A timely appeal from that decision was taken by the contractor to the Armed Services Board of Contract Appeals on September 25, 1953. The appeal was considered by the ASBCA after lengthy hearings. A final decision (ASBCA No. 2527) sustaining the contractor's appeal was rendered by the ASBCA on July 22, 1958. The ASBCA held that the contractor exercised the degree of care required of it under the law, and was not negligent in the storage and handling of the infested food components.

The administrative proceedings mentioned in the preceding paragraph were unrelated to—and certainly were not a prerequisite to the maintenance of—the present action for breach of contract. Hence, such proceedings did not toll the running of the statute of limitations with respect to the breach-of-contract claim that is involved in this case.

■ For the reasons outlined in this part of the opinion, it is my view that the contractor's claim first accrued not later than December 31, 1951, that the running of the statute of limitations was not tolled for any reason, and that the claim was barred by the 6-year statute of limitations when the present action was instituted on January 3, 1963.

It necessarily follows that the petition should be dismissed.

### THE COUNTERCLAIM

On April 13, 1964, the defendant filed a counterclaim in the amount of $1,-226.60.

With respect to the counterclaim, the evidence in the record shows that during the performance of the contract the defendant supplied to the contractor ration components and packaging materials in excess of the quantities actually needed by the contractor for the performance of the contract. In this connection, the contract provided that "Any components remaining on hand after the assembly of all food packets will be packed and returned to the Government within 30 days."

The excess Government-furnished property had a value of $3,226.60. Upon the completion of the contract, the defendant demanded the return of the excess Government-furnished property or the payment of its value. The contractor did not comply with the defendant's demand, but the defendant effected a partial reimbursement by withholding from the contractor the sum of $2,000 that was otherwise due the contractor. Hence, there is still due and owing the defendant from the contractor the sum of $1,-226.60 on account of the excess Government-furnished property.

However, the successful invocation by the defendant of the statute of limitations against the plaintiff's claim requires the court to dismiss the defend-

ant's counterclaim along with the plaintiff's petition.

 It has long been held that the 6-year statute of limitations relative to the institution of actions against the United States in this court is jurisdictional in nature and limits the jurisdiction of the court. Kendall v. United States, 107 U.S. 123, 125, 2 S.Ct. 277, 27 L.Ed. 437 (1882); Soriano v. United States, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); United States Nat'l Bank of Portland (Ore.) v. United States, 125 F.Supp. 250, 252, 129 Ct.Cl. 777, 779 (1954); Todd v. United States, 292 F.2d 841, 844, 155 Ct.Cl. 87, 93 (1961). Therefore, since the petition in the present case was filed more than 6 years after the plaintiff's claim first accrued, the Court of Claims does not have jurisdiction of such claim.

The power of the Court of Claims to adjudicate a counterclaim asserted by the United States in a case before the court is derived from 28 U.S.C. § 2508 (1958), which provides in part as follows:

> Upon the trial of any suit in the Court of Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.

 This statutory provision necessarily presupposes the assertion by a plaintiff of a claim as to which the Court of Claims has jurisdiction, since the attempted assertion in this court by a claimant of a claim outside the jurisdiction of the court would, in effect, be a void act. Therefore, as the Court of Claims is generally without authority to adjudicate claims by the United States against other persons, it has been held that where the United States has asserted in this court a counterclaim against a plaintiff and the plaintiff's claim is rejected because of a lack of jurisdiction, the counterclaim must be dismissed along with the plaintiff's petition, without regard to the merits of the counterclaim. B. and O. R. R. v. United States, 34 Ct.Cl. 484, 508 (1899); Alloy Products Corp. v. United States, 302 F.2d 528, 532, 157 Ct.Cl. 376, 383 (1962); Tuason Construction Co. v. United States, 166 Ct.Cl. 597 (1964).

Accordingly, as the plaintiff's claim in the present case is outside the court's jurisdiction, the defendant's counterclaim should be dismissed along with the plaintiff's petition, irrespective of the merits of the counterclaim.