**SOMALI DEVELOPMENT BANK and the Somali Democratic Republic**

v.

**The UNITED STATES.**

**No. 650–71.**

United States Court of Claims.

Dec. 18, 1974.

Frances Clark Barrie, Washington, D. C., for plaintiffs; Roger M. Dougherty, Washington, D. C., attorney of record. James M. O'Neill, Washington, D. C., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and KASHIWA and BENNETT, Judges.

COWEN, Chief Judge:

This case comes before the court on motions for summary judgment presented by plaintiffs and defendant. Since we conclude that this court lacks jurisdiction because plaintiffs' claim basically sounds in tort, we grant defendant's motion for summary judgment and dismiss plaintiffs' petition. Having decided the motions on that ground, we must also dismiss, as having no independent jurisdictional status, defendant's counterclaim.

A description of the relationship of the parties is somewhat complicated and is summarized below only to the extent necessary for an understanding of this opinion. The involvement of the parties (or their predecessors) began in September 1958, when the Development Loan Fund (DLF), an agency of the United States Government later known as the Agency for International Development (AID), authorized a two million dollar loan to Credito Somalo, a development bank in the less-developed country of Somalia (now the Somali Democratic Republic).[1] This proposed loan was extended by DLF in furtherance of the foreign policy of the United States[2] and had as its purpose to aid the development bank's own program of lending to private individuals and firms in Somalia. In general terms, money was to be lent by DLF to Credito Somalo at low interest rates and with a liberal repayment schedule. Credito Somalo would then reloan the same money at its own terms to local entrepreneurs who then would undertake certain needed industrial and agricultural projects in Somalia.

The original Loan Agreement (DLF Loan Number 35, later designated AID Loan Number 649–A–001) was entered into on March 31, 1959, by DLF, Credito Somalo, and the Government of Somalia, with the latter executing as guarantor of the loan. The original agreement provided for an interest rate of four percent per annum with a repayment term of 15 years, following a one-year grace period. To insure that the loaned funds were utilized for the purposes listed in the agreement, the entire two million dollar loan was not initially transferred to Credito; instead, specific disbursements were to be made by DLF "in accordance with the Loan Agreement". In essence, this "control" by the lending agency was accomplished in two ways. In Section 5.14 of the "Loan Agreement," Credito Somalo covenanted not to make loans to Somali industry of more than $100,000 without the prior written consent of DLF. Furthermore, sections 4.05 and 4.06 listed certain "conditions precedent" to the first disbursements of funds which included the setting up of a

---

1. A development bank has been defined as "a financial institution which is organized and operated to assist in the economic development of less developed countries and areas by financing and promoting private enterprises, particularly ventures of small and medium size. The purpose and function of development banks is first and foremost to serve as a channel and catalyst for investment in the private sector by providing injections of capital, enterprise and management into a developing economy." AID Manual Order 1524.1 (effective Dec. 10, 1963).

2. This type of economic assistance was originally extended by DLF under the Mutual Security Act of 1954, as amended, 22 U.S.C. § 1750 et seq. (1958). The assistance program was later taken over by the Agency for International Development under the Foreign Assistance Act of 1961, as amended, 22 U.S.C. § 2151 et seq. (1970).

separate and independent section of Credito Somalo that could accomplish competent technical review of the loan applications received from Somali businessmen.[3]

The original Loan Agreement was amended on two subsequent occasions. On March 9, 1961, the amortization schedule was revised at the request of Credito Somalo and the list of eligible projects was expanded. On August 10, 1964, the amortization schedule was again changed to permit the borrower additional time to repay the loan principal. In 1968, after the Somalian Government had created the Somali Development Bank as an independent entity, an agreement was signed by the Government of Somalia, the bank, Credito Somalo, and AID, with the Development Bank expressly assuming all obligations and responsibilities of Credito Somalo on the Loan Agreement as amended.

The parties are in accord that on October 1, 1964, the Somali Bricks and Tiles Manufacturing Company (Sombriti) requested a development loan from Credito Somalo in order to build a brick and tile plant near Mogadiscio, the capital city of Somalia. Sombriti did not plan to construct the plant itself; rather, it was Sombriti's intention to contract the construction to an Italian firm, Fonderie Officine Meccaniche Bongioanni. The Italian firm had prepared a "feasibility study" concerning this development project, which had convinced Sombriti that the project was sound. Since the amount of the sub-loan requested by Sombriti was in excess of $100,000, AID itself became involved, as its approval of the project was required under Section 5.14 of the Loan Agreement. After a delay of several months, the sub-loan of $190,500 was approved by AID.[4] However, during the interim Sombriti decided not to purchase the required machinery and equipment from the Italian firm but instead contracted with Interkiln Engineering, Inc. (Interkiln) of Houston, Texas. This American firm had belatedly submitted a bid substantially lower than the Italian firm and had promised closer personal supervision of the project's construction. Although promising in its contract with Sombriti to complete construction of the plant by 1966, Interkiln did not finish its job until April 1968. For various reasons the plant never got into operation, despite several attempts at modification by Interkiln.[5] The parties agree that the Somali Development Bank stopped making payments on its loan from AID on June 15, 1971.

I

In their cross motion for summary judgment, plaintiffs seek to recover damages in the amount of $358,115, plus interest, from the Government on account of losses sustained and expenses incurred in connection with the loan for the construction of the ill-fated brick and tile manufacturing plant. Plaintiffs attempt to bring their case within the court's jurisdiction by contending that the damages they suffered resulted, at least in part, from the defendant's breach of Sections 1.02 and 4.06 of the Loan Agreement.

Section 1.02 provides in substance that the purpose of the Loan Agreement is to assist the borrower in carrying out a program of lending to private individuals

---

3. Revised procedures in this regard were contained in DLF's Implementation Letter Number 1, dated July 29, 1959. These revisions were clearly accepted by Credito Somalo on August 5, 1959.

4. The total contract price for construction of the brick and tile plant was $246,868. The funds needed in addition to the DLF loan were provided by Credito Somalo and several individual Somali investors.

5. Sombriti claimed that the failure of the brick and tile plant was caused by faulty materials and workmanship on the part of Interkiln. Somali Bricks and Tiles Manufacturing Company v. Interkiln Engineering, Inc. (Civ.No. 71–H–158) (S.D.Tex., 1973) (unpub. opinion), aff'd, 488 F.2d 1056 (5th Cir. 1974). However, Sombriti was denied recovery in this proceeding, since the jury determined that Sombriti had made fraudulent misrepresentations during the contract negotiations. *Id.*

and entities in Somalia to finance the development of the following areas: textile industry, fisheries, tanning and leather manufacturing, meat processing, process of agricultural products, and cultivation and marketing of long-staple cotton, groundnuts, sesame and incense. This provision was breached, according to plaintiffs, because the agreement did not authorize the use of the loan to finance the construction of a brick and tile plant. However, plaintiffs overlook the fact that on March 9, 1961, prior to the date the brick and tile plant project was approved, the parties to the Loan Agreement amended it by a written instrument, which specifically added to the list of the named agricultural and industrial areas "such other agricultural and industrial areas as the DLF may agree to in writing."

Section 4.06 of the Loan Agreement provides in substance that prior to and as a condition precedent to the issuance of the first letter of commitment under the Loan Agreement, the borrower shall furnish evidence satisfactory to the DLF that:

(1) An autonomous section had been created in the borrower to carry out the project, and

(2) satisfactory procedures, including competent technical review, have been set up to handle applications for loans from such autonomous section.

■ There is a substantial dispute of fact between the parties regarding the extent to which the plaintiffs complied with these provisions of the Loan Agreement. However, we need not resolve this factual dispute, because it is clear that section 4.06 is a statement of obligations to be performed by the plaintiffs rather than by the United States; that the section is a provision which was written for the benefit of the Government, and that the Government may waive plaintiffs' lack of compliance without incurring any liability to the plaintiffs. Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968); Kenneth Reed Constr. Corp. v. United States, 475 F.2d 583, 201 Ct.Cl. 282 (1973).

■ Plaintiffs also maintain that the defendant breached a statutory duty owed to the plaintiffs in that the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 (1970) requires that assistance extended under that Act be based upon "sound plans and programs." Since the brick and tile plant was a failure, it is plaintiffs' view that they are entitled to recover because the Government violated the requirements of the statute by approving an unsound loan. While the novelty of this contention is interesting, there is no doubt that the statutory language quoted by plaintiffs was enacted for the benefit of the taxpayers of the United States and that it confers no right of action on the plaintiffs. See Rough Diamond Co. v. United States, 351 F.2d 636, 173 Ct.Cl. 15 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966) and cases cited therein.

■ We have had difficulty in analyzing plaintiffs' legal arguments, as well as their factual contentions. However, after a careful review of plaintiffs' motion and the accompanying exhibits, we have concluded that despite plaintiffs' allegations to the contrary, their cause of action sounds, in substance and in reality, in tort—a claim which is not within the court's jurisdiction.

In September 1962, AID contracted with a management consulting firm, Checchi & Co., to assist Credito Somalo in establishing an autonomous loan section for the purpose of training its personnel in procedures for handling loans and bank accounting. As explained in an affidavit by an AID official, AID took this action to improve the capability of the borrower so that it could discharge its responsibility for economic and technical review of projects on which it made loans. However, plaintiffs contend that the brick and tile factory project was conceived, induced, and implemented by the defendant and by Checchi & Co., which plaintiffs characterize as the Government's agent. Chec-

chi & Co. actively worked with Credito Somalo for a period of about 3 years until September 1965, but defendant denies that Checchi & Co. was responsible for the approval of the brick and tile project and has attached to its motion documentary exhibits showing that Credito Somalo made an analysis of the project and found it to be deserving of financing by the bank, because it was both technically and economically feasible. The evidence submitted by plaintiffs concerning the involvement of Checchi & Co. consists of a letter written by the president of the Somali Development Bank on July 30, 1970. He stated that most of the loans which the bank made while Checchi was assisting it ended as uncollectible loans and that Checchi had induced AID to invest in a project which was economically unfeasible.

Plaintiffs also claim that AID selected and approved Interkiln as the construction contractor and thereby assumed responsibility for the success of the project. The defendant denies this and has submitted affidavits to the effect that Sombriti made the decision to award the contract to Interkiln after consultation with Credito Somalo. An examination of the documents submitted with the parties' motions does not show that AID recommended Interkiln or tried to induce Credito Somalo or Sombriti to utilize the services of that company. However, we need not discuss at length nor resolve the material variations between plaintiffs and defendant as to the proper interpretation of the documentary evidence for, as we have stated above, plaintiffs basically complain of tortious acts and misconduct on the part of defendant and its represent-resentatives. In addition to the contentions that the brick and tile factory project was conceived and induced by Checchi & Co., and that the defendant controlled the project to the extent of finding and approving Interkiln, the contractor, plaintiffs allege that the Washington office of AID carefully reviewed and approved the application for the subloan to finance the brick and tile factory even though there was a question as to the financial soundness of the project; that, as a result of these activities of the defendant, it owed a fiduciary duty to the plaintiffs; that defendant assumed responsibility as a guarantor of the success of the project, and that it thereby became liable to plaintiffs for damages resulting from the default of Sombriti on the loan made by Credito Somalo.

The decision of the Supreme Court in United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961), removes any doubt that claims based on negligent misrepresentation, wrongful inducement, or the careless performance of a duty allegedly owed, are claims sounding in tort. In that case, the Court held that the United States was not liable to the purchaser of a home who relied on an inaccurate appraisal by the Federal Housing Administration and who was thereby induced to pay a purchase price in excess of the fair market value of the house. In speaking of the acts of the Government, which were quite similar to those complained of by plaintiffs in this case, the Supreme Court there stated:

> To say, as the Fourth Circuit did, that a claim arises out of "negligence," rather than "misrepresentation," when the loss suffered by the injured party is caused by the breach of a "specific duty" owed by the Government to him, i. e., the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of "negligent misrepresentation," as is clearly, if not conclusively, shown by the authorities set forth in the margin, * * * * [366 U.S. at 706, 81 S.Ct. at 1300]

In United States v. Chelsea Towers, Inc., 295 F.Supp. 1242 (D.N.J.1967), the United States undertook to foreclose a mortgage on a cooperative apartment

building, and the borrower defended on the ground that it had been deluded and hoodwinked into an unconscionable bargain by the purchasing and financing machinations of the promoters, developers, builders, financiers, and the FHA. Relying on the Supreme Court's decision in *Neustadt*, the District Court held that if there were such negligent misrepresentations by Government employees or agencies, such conduct is "tantamount to that giving rise to a common law action of deceit and is largely confined to the invasion of financial or commercial interests, for which no action lies against the Government, such being barred by the Federal Tort Claims Act, 28 U.S.C. § 2860(h)." 295 F.Supp. at 1247. To the same effect is United States v. Longo, 464 F.2d 913 (8th Cir. 1972).

## III

We turn now to a consideration of plaintiffs' argument that the acts and conduct of the Government and its agents created an implied contract by which the Government warranted the success of the brick factory. We are compelled to say that this is only a contention, because plaintiffs point to no facts which would give rise to an implied contract. It is fundamental that to constitute an implied contract upon which one may recover under the Tucker Act, there must be some consideration moving to the United States, or the Government must have received money under a duty to pay it over, or the claimant must have had a lawful right to the money when it was received, such as money paid under a mistake. Knote v. United States, 95 U.S. 149, 156, 24 L.Ed. 442 (1877). Before a contract may be implied in fact, there must be a meeting of the minds which is inferred from the conduct of the parties, and in the light of the surrounding circumstances, shows their tacit understanding. Baltimore and Ohio R.R. Co. v. United States, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923). There is not one iota of evidence in the record before us which shows that there was any consideration moving to the United States for the alleged warranty or guaranty that the brick and tile factory would be financially successful. Moreover, there is no evidence which indicates that there was a meeting of the minds between authorized representatives of the Government and plaintiffs that the Government would guarantee the success of the project or indemnify the plaintiffs from any loss or damage incurred as a result of the loans made to Sombriti.

It is well settled that such a warranty as plaintiffs claim will not be implied on the part of the United States where the warranty is not expressly provided for in a statute or contract. Henry Barracks Housing Corp. v. United States, 281 F.2d 196, 150 Ct.Cl. 689 (1960); Chelsea Towers, Inc., *supra. See also* Farm Security Administration v. Herren, 165 F.2d 554 (8th Cir.), cert. denied, 333 U.S. 875, 68 S.Ct. 904, 92 L.Ed. 1151 (1948), which is so closely analogous that it is persuasive authority for holding that the assistance which AID furnished to the plaintiffs through Checchi & Co. and the control which AID exercised with respect to the sub-loan to Sombriti did not create an implied contract by the Government to guarantee the success of the factory or the soundness of the sub-loan.

## IV

The defendant has moved for judgment against plaintiffs on a counterclaim for the amount due on plaintiffs' unpaid loan, plus interest, and we find there is no valid defense to the counterclaim. As shown in the discussion above, however, we have looked to the substance of plaintiffs' claim rather than to the terminology used by plaintiffs and have determined that the claim is in reality a tort claim, which is expressly excluded from our jurisdiction by 28 U.S.C. § 1491. This holding is in accord with defendant's contentions.[6] Since we are without jurisdiction of plaintiffs' claim, defendant's counterclaim must fall with plaintiffs' petition. Mulholland v. United States, 361 F.2d 237, 175 Ct.Cl. 832 (1966).

6. Defendant's Reply Brief at 3.

## V

For the reasons stated above, defendant's motion for summary judgment is granted to the extent that plaintiffs' petition is dismissed. Plaintiffs' cross motion for summary judgment is denied, but defendant's counterclaim is also dismissed.

KASHIWA, Judge (concurring):

I concur fully with the Chief Judge's opinion but with relation to the portion of the case to which a partial dissent has been filed, I must point out that the rule on which the partial dissent relies is subject to qualifications. In the very case cited by the dissent, Ralston Steel Corp. v. United States, 340 F.2d 663, 169 Ct.Cl. 119, cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965), this court referred to certain qualifications in 340 F.2d on page 667, footnote 4 on page 125 of said case as follows: [7]

On the qualification of non-frivolity and substantiality, see Montana Catholic Missions v. Missoula County, 200 U.S. 118, 130, 26 S.Ct. 197, 50 L.Ed. 398 (1906); The Fair v. Kohler Die & Specialty Co., *supra*, 228 U.S. [22] at 25, 33 S.Ct. 410 [57 L.Ed. 716]; Levering & Garrigues Co. v. Morrin, *supra*, 289 U.S. [103] at 105–106, 53 S.Ct. 549 [77 L.Ed. 1062]; Bell v. Hood, *supra*, 327 U.S. [678] at 682–683, 66 S.Ct. 773 [90 L.Ed. 939]; Montana-Dakota Utilities Co. v. Northwestern Public Service Co., *supra*, 341 U.S. [246] at 249, 71 S.Ct. 692 [95 L.Ed. 912].

The alleged contractual claims in part I were clearly not substantial. The dissent found no "difficulty" in agreeing with the majority on part I. In Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105–106, 53 S.Ct. 549, 77 L.Ed. 1062 (1933), the Court defined "unsubstantial" as being

* * * obviously without merit, or "because its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288 [30 S.Ct. 326, 327, 54 L.Ed. 482]; McGilvra v. Ross, 215 U.S. 70, 76–77, 80 [30 S.Ct. 27, 54 L.Ed. 95]; Norton v. Whiteside, 239 U.S. 144, 153 [36 S.Ct. 97, 60 L.Ed. 186]; Bianchi v. Morales, 262 U.S. 170 [43 S.Ct. 526, 67 L.Ed. 928]; Kansas v. Bradley [8 Cir.], 26 Fed. 289, 290; Harris v. Rosenberger [8 Cir.] 145 Fed. 449, 452.

The tortious claims were clearly beyond the jurisdiction of this court. Tort cases brought in this court naturally lack substantiality as far as the jurisdictional reaches of this court are concerned because the previous decisions of this court clearly prohibit such actions.

BENNETT, Judge (concurring in part and dissenting in part):

I have no difficulty in agreeing with part I of the majority's opinion. Defendant did not breach its express contract with plaintiffs nor did it contravene any statutory obligation owed to them. I agree also with part III in that there is no implied contract here. I respectfully disagree, however, with the majority's conclusion that, having found no breach, the court lacks jurisdiction to base its result upon this finding because the claims basically are of a tortious nature and we have no authority to decide tort cases.

It is undisputed that there was an express contract between the parties. Plaintiffs assert, *inter alia*, a breach of specific clauses of that contract. The jurisdictional requirements of 28 U.S.C. § 1491 are thus met with respect to that assertion.[8] Whether the Government's

---

7. The full citations for the following cases in the quoted footnote are: The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913); Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Montana-Dakota Utilities Co. v.

Northwestern Public Service Co., 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912 (1951).

8. *See* Ralston Steel Corp v. United States, 340 F.2d 663, 666–669, 169 Ct.Cl. 119, 123–128, cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14

actions in pursuance of the contract were tortious is not a matter we need to decide in this case. We are required only to determine whether defendant breached its contract. We clearly have jurisdiction to make this determination, as the majority has apparently done, whether or not there is also a tort claim here. It follows that we have jurisdiction to rule on defendant's counterclaim and should do so, even if a judgment for defendant on the counterclaim might be uncollectible, as pointed out in oral argument. The latter point is not our concern, although such a judgment might be a public service in highlighting problems worthy of concern elsewhere in the Government. The counterclaim is for almost one million dollars.

L.Ed.2d 723 (1965), where the full court, upon authority of several Supreme Court cases cited, held that an arguable allegation of breach of contract is all that is required to establish