**Gerald S. KRIGEL**

v.

**The UNITED STATES.**

No. 434–78.

United States Court of Claims.

Oct. 21, 1981.

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Myles J. Tralins, North Miami, Fla., attorney of record, for plaintiff. Tralins & Potash, North Miami, Fla., of counsel.

Elizabeth Langer, Washington, D. C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, BENNETT and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed August 26, 1981, requesting that the court adopt the recommended decision of Trial Judge Roald A.

Hogenson, filed July 17, 1981, pursuant to Rule 134(h), as the basis for its judgment in this case since plaintiff has failed to file a notice of intention to except or exceptions thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth*, it hereby grants defendant's motion and affirms and adopts the decision as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff is not entitled to recover, and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HOGENSON, Trial Judge: Plaintiff, Gerald S. Krigel, brought this action to recover $72,750 he claims that the United States owes him for its alleged failure to redeem fully a quantity of mutilated United States currency he turned in to the Department of the Treasury for redemption. It is concluded that defendant complied with its obligations in redeeming plaintiff's currency and plaintiff is not entitled to recover.

Mr. Krigel and his father, Ben Krigel, held joint savings accounts at two banks in Michigan. From these accounts plaintiff's father or his bookkeeper, Gloria Anderson, withdrew a total of $427,263.84 in cash between October 1974 and September 1976, primarily in one hundred dollar denomina-

tions. Plaintiff placed some of the currency withdrawn from these accounts into a metal box that he had hidden in the basement of his mother's house and used some of it in running his construction business.[1] The currency that Mr. Krigel had placed in the box was tightly packed and consisted of one hundred dollar and fifty dollar notes.

During the winter of 1976, the basement of the house in which plaintiff had hidden the box flooded. Plaintiff inspected the money after the flood and thought that it had not been damaged. In February 1977, plaintiff was preparing to move to Miami and intended to use the money to finance his new life in Florida. On February 3, 1977, plaintiff went to his mother's house to retrieve the box. Upon opening the box, plaintiff discovered that the currency had swollen in size, rotted, and become compressed into a solid mass. Due to the swelling, plaintiff could remove the money only by cutting the side of the box open with a pair of metal shears. The mass of currency was wet, mildewed, dirty, and was not recognizable as currency. When handled, the money would break into pieces.

Plaintiff and his fiancee went to her apartment where they attempted to dry the currency by placing it on the heating registers and by blowing air over it with hair dryers. After drying some of the currency and separating pieces of individual bills, plaintiff was able to reconstruct with scotch tape approximately $70,000 worth of bills.

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. Plaintiff's evidence on the amounts of money that went into the box and his business is contradictory and inconclusive. Mr. Krigel testified that the cash withdrawn from the accounts went into the box, though he also testified that the box contained only $250,000 of the $427,263.84 withdrawn. Ms. Anderson testified that approximately $20,000–22,000 of the money went into plaintiff's business and approximately $250,000–260,000 to Mr. Krigel personally. She also testified, however, that the difference between the amount withdrawn and the amount that went to Mr. Krigel personally would have been used in the business.

The only conclusion to be drawn from this evidence is that neither Mr. Krigel nor Ms. Anderson knew with any certainty how much money went into the business or to plaintiff himself.

That plaintiff did not know the precise amount of currency in the box is also indicated by his admission at trial that he did not know how the foreign currency that the government returned to him got into the box. Furthermore, plaintiff has contended that the box actually contained approximately $250,000. For purposes of this case, however, he has reduced that figure to $200,000 because it is a round number and hence easier to work with. It seems highly unlikely that plaintiff would so casually dismiss $50,000 if he in fact knew how much money the box contained.

As the currency, which was spread over the floors of the apartment, dried, it became brittle and easily broke into pieces. At this point, plaintiff became afraid of further damaging the currency and stopped his efforts at reconstructing the money.

Early on the morning of February 4, 1977, plaintiff packed the money into plastic bags and placed the bags into his valise. He then checked into a nearby motel and from there called a former business associate, Harry Weitzer, for advice. When Mr. Weitzer arrived, plaintiff had spread the money out over the room. The money was by this time discolored and torn and closely resembled corn flakes. Through the efforts of Mr. Weitzer, plaintiff contacted the Mutilated Currency Branch of the United States Department of the Treasury, which redeems mutilated or otherwise damaged United States currency. Because plaintiff was very tired and nervous, Mr. Weitzer accompanied him to the Mutilated Currency Branch in Washington, D. C.

Plaintiff and Mr. Weitzer arrived at the Treasury Department on February 4, 1977, and met with Mrs. Louise G. Rice, Manager of the Mutilated Currency Branch. Mr. Krigel informed Mrs. Rice that he had $200,000 in damaged currency that he wished to have redeemed immediately. Mrs. Rice told plaintiff that his case appeared difficult and would take several months to process. She suggested to Mr. Krigel that he might be able to redeem the approximately $70,000 that he had reconstructed more quickly if he were to bring it to the Federal Reserve Bank in Detroit. Plaintiff accepted this advice and decided to take the reconstructed money back to Detroit, leaving the remainder with Mrs. Rice. Due to a misunderstanding as to the amount of money plaintiff would be taking with him, Mrs. Rice made out an initial receipt in the amount of "$70,000?". When Mrs. Rice realized she had written an incorrect amount, she crossed out the "$70,000?" and inserted "$130,000?". The receipt then

read: "Mutilated currency claimed to be in the sum of $130,000? has been received for redemption. Its value, as determined by our examination and count, will be paid by check." Mrs. Rice then accepted plaintiff's currency, placed it into a box, sealed it, and delivered it to the control clerk. Neither Mrs. Rice nor Mr. Krigel attempted to count the currency left with the Mutilated Currency Branch.[2]

Mr. Krigel returned to Detroit on February 4, 1977, and redeemed $73,800 of the reconstructed currency at the Federal Reserve Bank. The bank declined to redeem fragments of 7 one hundred dollar bills and returned them to plaintiff who sent them by certified mail to Mrs. Rice at the Treasury Department. The Mutilated Currency Branch received the fragments on February 10, 1977, and a currency examiner was assigned to reconstruct these bills. When the examiner discovered that the bills were a part of Mr. Krigel's original claim, she returned the fragments to the control clerk who consolidated them with the original claim. Initially, the control clerk assigned plaintiff's case to Mrs. Wilson, a currency examiner. Mrs. Rice removed Mrs. Wilson from the case when she stated that she would not be willing to go to court in the event that Mr. Krigel initiated a lawsuit on his claim. Mrs. Rice then assigned Mrs. Gracie Scruggs, a currency examiner who had no objections to the possibility of appearing in court, to plaintiff's case.

On February 24, 1977, Mrs. Scruggs obtained the sealed box containing plaintiff's currency, opened it in the presence of another currency examiner, and inventoried the contents. The box contained the scraps of the 7 one hundred dollar bills that plaintiff had mailed to the Department, a plastic bag with 2 stacks of the compressed currency, and another plastic bag containing small pieces of currency. On March 2, 1977, Congressman John D. Dingell wrote to the Department of the Treasury asking that Mr. Krigel's case be processed as expeditiously

---

**2.** Plaintiff had never removed the money from the box and counted it prior to bringing it to Washington. Plaintiff has claimed that he kept

a cumulative total of the amount of money in the box, but has introduced no evidence of such a writing.

as possible. As a result, plaintiff's claim was processed more rapidly than it would have been under ordinary circumstances

Because Mr. Krigel's claim exceeded $5,000, the Mutilated Currency Branch automatically notified the Internal Revenue Service, which orally requested that a "hold" be placed on plaintiff's claim. On March 7, 1977, Mr. Melvin Gabourel, of the Division of Currency Claims, informed the IRS by letter that if no written report requesting that payment to plaintiff be withheld were received within 30 days, the claim would be paid.

On April 18, 1977, Mrs. Scruggs completed the examination of plaintiff's damaged currency, and determined that it had a value of $54,750. In addition, she rejected $2,500 and some foreign currency as having no redemption value. On the same date, Mr. Gabourel again contacted the IRS and requested verbal authorization to pay plaintiff's claim. The IRS informed Mr. Gabourel that he could pay the claim. Plaintiff's claim was settled on April 20, 1977, when a check for $54,750, plus the foreign currency, was mailed to him.

Following receipt of the $54,750, plaintiff filed suit in this court alleging that the United States failed to redeem $72,750 in mutilated currency that he had turned in to the Treasury Department. As a means of invoking this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (1976), plaintiff contends that he has an implied-in-fact contract with the United States to redeem the full amount of currency he claims to have delivered. Defendant denies that any implied-in-fact contract exists and argues that this court has no jurisdiction over this case. For the purpose of resolving the jurisdictional issue, it is unnecessary to decide whether an implied-in-fact contract exists because plaintiff's claim is founded upon a statute, as well as a regulation of an executive department.

Under 31 U.S.C. § 773a (1976), any lawful holder of United States currency may exchange it, dollar for dollar, for other currency in a manner to be prescribed by regulations issued by the Secretary of the Treasury.[3] Pursuant to the authority conferred by this statute, the Secretary has issued regulations governing the exchange of paper currency. See Exchange of Paper Currency and Coin, 31 C.F.R. § 100.2 (1980) (regulations apply to exchange of Federal Reserve Notes). The section pertaining to the exchange of mutilated paper currency provides:

Lawfully held paper currency of the United States which has been mutilated will be exchanged at its face amount if clearly more than one-half of the original whole note remains. Fragments of such mutilated currency which are not clearly more than one-half of the original whole note will be exchanged at face value only if the Treasurer of the United States is satisfied that the missing portions have been totally destroyed. His judgment shall be based on such evidence of total destruction as he deems necessary and shall be final.

Id., § 100.5. The obligation of defendant to redeem mutilated currency is thus imposed by statute and defined by regulation. Plaintiff's allegation that defendant failed to redeem properly his currency states a claim founded upon both the statute and the regulation. As such, plaintiff's claim is within the jurisdiction of this court. 28 U.S.C. § 1491 (1976).

As the basis for its substantive argument, plaintiff alleges that he had an implied-in-fact contract with the United States, which breached the contract by not redeeming the full amount of mutilated currency he delivered to the Treasury Department. Plaintiff contends that by accepting his currency the defendant, through its employees at the

---

**3.** Section 773a provides:

"The lawful holders of the coins or currencies of the United States shall be entitled to exchange them, dollar for dollar, for other coins or currencies which may be lawfully acquired and are legal tender for public and private debts. The Secretary of the Treasury is authorized and directed to make such exchanges and payments upon presentation hereunder in the manner provided in regulations prescribed by him."
28 U.S.C. § 773a (1976).

Mutilated Currency Branch, impliedly agreed to return to plaintiff an amount of money equal to the amount of mutilated currency plaintiff claimed to be turning in for redemption. Though plaintiff may well have believed that the defendant would accept his word as determinative of the value of the currency, it is clear that no one else shared this belief.

■ The receipt that plaintiff received for his money stated on its face that he would receive only the value of his currency "as determined by our examination and count." Furthermore, the amount written on the receipt represents the alleged value of the currency. It is written prior to any count and is usually followed by a question mark to indicate that it is not necessarily an accurate figure. The regulation governing the exchange of mutilated currency requires the presentation of more than one-half of a note in order to redeem it at face value. The employees of the Mutilated Currency Branch testified that redemption of mutilated currency is subject to their count and verification and that payment is made only on mutilated currency that has been positively identified by a currency examiner.

In light of all this, it is evident that defendant's employees, assuming *arguendo* they were authorized to bind defendant, did not agree to return $130,000 to plaintiff, nor did their acts manifest such an agreement. There being no agreement as to what performance was due, it follows that there was no meeting of the minds, and, hence, no implied-in-fact contract.

What obligation does exist where defendant redeems damaged currency arises from statute, 31 U.S.C. § 773a (1976), and is defined and limited by the regulations, 31 C.F.R. § 100.5 (1980), adopted pursuant to the statute. Thus, a person would be entitled to receive full value for mutilated currency only upon presenting more than one-half of the original note. In the present case, the defendant has fully complied with its obligations in redeeming damaged currency. Plaintiff has not shown that he delivered any more than $54,750 in redeemable currency to the defendant. If the redemption process is to be run in a just, orderly, and efficient manner, the responsibility for reconstructing and counting mutilated currency must lie with the Department of the Treasury, not with the persons seeking to have the money redeemed. ·

■ Of the money plaintiff turned in, defendant redeemed at full value currency in the amount of $54,750 and determined that $2,500 and some foreign currency had no redemption value. This total was short of the amount plaintiff claimed to have given to the Treasury by approximately $72,750.[4] Plaintiff has alleged that this money was either stolen or misplaced by employees of defendant. This allegation is without evidentiary support. The more likely explanations for the alleged shortage are either that plaintiff was unaware of the precise amount of money in the box[5] or that the currency in excess of $57,250,[6] if any, had been reduced to unrecognizable fragments by rotting and plaintiff's subsequent efforts to reconstruct the currency.

■ Plaintiff further contends that defendant negligently breached its contract to redeem plaintiff's damaged currency by failing to redeem the $72,750. Because no contract ever arose, plaintiff at best states a claim of negligence, not breach of contract. A claim based on the careless performance of duty by a government employ-

---

**4.** Plaintiff's arithmetic in calculating this amount is faulty. If the box contained $200,-000 and plaintiff redeemed $73,800 at the Federal Reserve Bank in Detroit, then the amount remaining with defendant would have been $126,200, not $130,000. The alleged shortage should therefore be $68,950 instead of $72,750.

**5.** A substantial amount of the money could have been used in plaintiff's business. Plain-tiff's willingness to reduce his claim from $250,000 to $200,000 and his lack of knowledge concerning the origin of the foreign currency in the box also undermine the credibility of his assertion that he turned over an additional $72,750 to defendant.

**6.** The amount redeemed, $54,750, plus the amount with no redemption value, $2,500.

ee sounds in tort and is beyond the jurisdiction of this court. *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974).

For the above reasons, it is concluded that plaintiff delivered to the Treasury Department on February 4, 1977, no more than $54,750 in redeemable currency and is not entitled to any further recovery. Plaintiff's petition should be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact and foregoing opinion which are adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

