**JOHNSON CONTROLS WORLD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–612C.**

United States Court of Federal Claims.

April 28, 1999.

 

Dale H. Oliver, Los Angeles, CA, for plaintiff. Paul E. Pompeo, Vice President and General Counsel, Johnson Controls World Services, Inc., Cape Canaveral, FL, and Roger N. Boyd, Terry L. Albertson, and Linda S. Bruggeman, Crowell & Moring, Washington, DC, of counsel.

Terry M. Petrie, Washington, DC, with whom was Acting Assistant Attorney General, David W. Ogden, for defendant. Stephen R. Dooley, Brian M. Kingston, and Margaret R. Altman, Defense Logistics Agency, and Maj. Rebecca E. Pearson, United States Air Force Legal Services, of counsel.

## OPINION

MILLER, Judge.

This contract case is before the court after argument and supplemental briefing on plaintiff's motion to dismiss the complaint pursuant to RCFC12(b)(1). The sole issue under consideration is whether the court may retain concurrently jurisdiction over two government claims that request the same underlying quantum based on the same triggering events, distinguished only by the different clauses under which interest due is calculated.

## FACTS

The two contracts involved are among a longstanding series of contracts awarded by the Department of the Air Force (the "Air Force") for the performance of services on the Eastern Test Range (the "ETR") dating back to 1953. After numerous business reorganizations, name changes, and asset transfers, Johnson Control World Services, Inc. ("plaintiff"), succeeded Pan American World Airways, Inc. ("Airways"); Pan Am World Services, Inc. ("PAWS"); and Pan Am Corporation under Contract No. F08606–78–C–0004, (the "1978 ETR contract") and Contract No. F08606–84–C–0001 (the "1984 ETR Contract").[1]

Special provision J.33 of the 1978 ETR contract stated:

a. It is recognized that the contractor's pension plan is not presently fully funded. The unfunded liability is being amortized consistent with the provisions of the Employee Retirement Income Security Act of 1974, applicable Internal Revenue Service Regulation, and the contractor's usual practices for funding such liabilities. The estimated cost of this contract does not include any amount for the unfunded liability for other than the period under contract.

b. If as a result of final close-out of this contract or any follow-on contracts, which-

---

1. The Air Force awarded the 1978 ETR contract to Airways on September 19, 1977, and the 1984 ETR contract to PAWS, effective October 1, 1983. Johnson Controls, Inc., purchased the as- sets of PAWS on May 5, 1989. In January 1991 PAWS changed its name to Johnson Controls World Services, Inc.

ever occurs later, the contractor's segment is closed, the contractor shall submit to the Contracting Officer a statement of this segment's actuarially determined liability and plan assets as computed in accordance with the provisions of [Cost Accounting Standard] 413.

c. Pension fund adjustments will be determined in accordance with DAR Section 15, Part 2. Upon receipt of such statement and supporting documentation, the Contracting Officer, after audit review, shall negotiate with the contractor the amount considered as the fund deficit or excess. The difference between the market value of the assets and the actuarial liability for the segment will be considered as an adjustment to previously determined pension costs.

d. Any adjustment due to a deficit shall be treated as an allowable reimbursable (out-of-target) cost under General Provision 3 and General Provision 4. In such event, an adjustment to the estimated cost of this contract shall be negotiated. That portion of any excess applicable to this contract shall be applied in reduction of any payment to be made by the Government under this contract or will otherwise be credited or paid by such other means as the Contracting Officer may direct.

e. Failure to agree upon the amount of payment or repayment shall be treated as a dispute within the meaning of the clause entitled "Disputes" of the General Provisions.

The 1978 ETR contract incorporated by reference the pertinent clauses of the Armed Service Procurement Regulations ("ASPR") requiring the contractor's compliance with all applicable Cost Accounting Standards ("CAS"). Among these clauses ASPR 7–104.83(a)(5), Cost Accounting Standards, stated that the contractor shall

[a]gree to an adjustment of the contract price or cost allowance, as appropriate, if he or a subcontractor fails to comply with an applicable Cost Accounting Standard ... and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States together with interest thereon computed at a rate determined by the Secretary of the Treasury pursuant to Public Law 92–41, 85 STAT. 97, or seven percent (7%) per annum, whichever is less, from the time payment by the United States was made to the time the adjustment is effected.

The 1978 ETR contract also incorporated by reference ASPR 7–104.39, Interest. This clause permitted interest to accrue from "the date of the first written demand for payment" on "all amounts that become payable by the Contractor to the Government under this contract," unless paid within 30 days from the date due. As a "follow-on" contract to the 1978 ETR contract, the 1984 ETR contract continued subject to the J.33 clause and the requirements of the CAS.[2] The 1984 ETR contract also incorporated by reference updated versions of ASPR 7–104.83(a)(5) and ASPR 7–104.39, in a form virtually identical to their predecessors.

Performance under the ETR contracts was completed on September 30, 1988. Between November 1991 and November 1992, plaintiff terminated and cashed out its pension plan under the ETR contracts, receiving a gross reversion of $49,618,599.00. In addition, plaintiff received approximately $2,037,683.00 in mortality credits under participating insurance contracts retained by plaintiff's predecessor in interest. By letter dated June 28, 1993, plaintiff submitted to the Divisional Administrative Contracting Officer ("DACO") its request for a final decision regarding alleged noncompliance with CAS 413.[3]

---

**2.** Although the 1984 ETR contract did not contain Special Provision J.33, Special Provision H.871 stated:

The proposed change between Defined Benefits Plan and Defined Contribution Plan is subject to subsequent review in accordance with cost principles in effect as of the date of this contract. This review will include consideration of any entitlement for cost or credits to

the Government in accordance with the Cost Principles and other terms and conditions of this contract.

**3.** CAS 413(c)(12) provides:

If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespec-

In its claim plaintiff (1) recounted a series of communications and negotiations initiated by plaintiff in 1991 in which plaintiff, in good faith, attempted, but failed to conclude, settlement discussions with the Air Force regarding plaintiff's alleged noncompliance with CAS 413; (2) asserted that, in the course of these communications and negotiations, plaintiff had complied with CAS 413 by providing the required determination of the difference between the actuarial liability and the market value of the subject pension find assets as of the alleged segment closure corresponding to the conclusion of the ETR contracts in September 1988; and (3) advised the DACO that, despite the delegation of authority over CAS issues to the Air Force contracting officer on August 24, 1991, under federal regulation the DACO has exclusive authority over CAS noncompliance determinations and that such authority cannot be retained by or delegated back to the agency contracting officer.

On March 5, 1997, the Air Force contracting officer issued her final decision and demand for payment "for noncompliance with contractual and regulatory requirements to identify and refund the pension plan surplus [on the 1978 ETR contract and the 1984 ETR contract] and provide credits for known overbilling of pension costs." The contracting officer based her decision on the occurrence of a "segment closure" upon the completion of the ETR contracts in September 1988 and plaintiff's subsequent failure to conduct an "asset versus liability" assessment required by provision J.33 in the 1978 ETR contract and provision H.871 in 1984 ETR contract. The contracting officer's final decision explained that, because plaintiff was unwilling to recognize its liability under these clauses, an overbilling and overfunding of the pension plan in the amount of $56,115,322.00 resulted. The decision noted that, if plaintiff failed to remit this amount to the Government within 30 days, interest would accrue from the date of demand at a rate established in the contract.

On April 9, 1998, the DACO issued her final decision regarding plaintiff's noncompliance with CAS 413 related to its pension fluid accounting. The decision cited plaintiff's failure to conduct an asset versus liability assessment as of the alleged segment closure in September 1988 as the basis for the Air Force's demand of surplus pension assets in the amount of $56,882,446.00. However, unlike the decision of the Air Force contracting officer, which included interest accruing from the date of first written demand, the DACO demanded interest accruing from the date of the Air Force's original overpayment into the pension fund, *i.e.*, the date of the alleged segment closure. Thus, the DACO's decision demanded an amount from plaintiff totaling $79,765,631.00: $56,882,446.00 for the noncompliance and $22,883,185.00 in interest.

Plaintiff appealed the final decision of the Air Force contracting officer on May 19, 1997, which is currently pending as *Johnson Controls World Services. Inc. v. United States*, No. 97–357 C (Fed.Cl., filed May 20, 1997) (the "357 action"). This action challenges the Air Force contracting officer's decision claiming pension plan surplus and revisionary credits, plus interest. On July 27, 1998, plaintiff filed its complaint in this case, No. 98–612 C (the "612 action"), which challenges the DACO's decision claiming interest calculated from an earlier date, as well as pension plan surplus. Plaintiff thereafter filed its motion to dismiss the 612 action for lack of subject matter jurisdiction.

## DISCUSSION

It is well established that, in passing on a motion to dismiss for lack of jurisdiction over the subject matter, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S.

---

tive of whether or not the pension plan is terminated.... The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs. Although plaintiff's brief indicates expressly that the 1984 ETR contract was subject to CAS 413(c)(12), while not indicating that the 1978

ETR contract was similarly so subject, for the purposes of the present motion, the issues regarding CAS 413 noncompliance are the same for both contracts. Special Provision J.33, which both contracts contained, requires the contractor, in the event of a segment closure, to submit an accounting of its pension assets in accordance with CAS 413.

**510**

232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A motion to dismiss should not be granted " 'unless it appears beyond doubt that the [non-movant] can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 236, 94 S.Ct. 1683 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted)). All factual allegations in the complaint, or in this instance, the counterclaim, are to be considered true and correct. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The non-movant, however, bears the burden of establishing the court's jurisdiction over the complaint or counterclaim by a preponderance of the evidence. *See id.* Relevant evidence outside the pleadings, may be considered to resolve factual disputes. *See id.*

28 U.S.C. 516 (1994), provides: "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General." "Once a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation." *Sharman Co. v. United States*, 2 F.3d 1564, 1571 (Fed.Cir.1993) (citing *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 465, 534 F.2d 889, 901 (1976) (explaining that 28 U.S.C. 516–520 vest the Attorney General with exclusive and plenary power to supervise and conduct all litigation to which United States is a party)). Because the power of the Department of Justice is so inclusive, however, it must be narrowly construed. *See Case, Inc. v. United States*, 88 F.3d 1004,

1011 (Fed.Cir.1996); *Hughes Aircraft*, 209 Ct.Cl. at 465, 534 F.2d at 901.

A decision by the contracting officer is a prerequisite to invoking the jurisdiction of the Court of Federal Claims under the Contract Disputes Act of 1978, 41 U.S.C.A. 605(a) (West Supp.1998). *See Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 181, 645 F.2d 966, 971 (1981). *Sharman* renders the timing of the contracting officer's decision crucial. If the Department of Justice is defending a contracting officer's decision, the contracting officer lacks jurisdiction to render a decision on the same claim.

Plaintiffs motion, although styled as a motion to dismiss for lack of subject matter jurisdiction, essentially seeks nullification of the DACO's decision.[4] Plaintiff asserts that the DACO could not issue a final decision subsequent to the Air Force Contracting Officer's decision because each " 'alleges entitlement to the same money based on the same partial performance, only under a different legal label.' " Plf's Br. filed Oct. 6, 1998, at 6 (quoting *Sharman*, 2 F.3d at 1571). Because the subject matter of the 612 action was already in litigation upon the filing of plaintiffs complaint in the 357 action, plaintiff concludes that the doctrine in *Sharman* and its progeny divested the DACO of her authority to issue a second decision on a matter then under the exclusive authority of the Department of Justice. The question thus devolves to whether a claim based on an alleged segment closure in 1988 requesting a refund of the pension plan surplus subject to interest accruing from the date of demand (contract interest) is the same as a claim based on the same alleged 1988 segment

4. Plaintiff's complaint in the 612 action requests the court, *inter alia*, to find that plaintiff complied with CAS 413 and that "the court determine that the United States' claim is barred by 41 U.S.C. 605(a) . . . ." Plf's Compl. filed July 27, 1998, at 29, ¶ 5. Defendant, in its answer, asserted a counterclaim requesting the court to enter judgment in its favor "in the amount not less than $79,765, 631, plus Contract Disputes Act interest" and that the court dismiss plaintiffs complaint. Def's Ans. filed Nov. 12, 1998, at 34.

The court treats plaintiffs motion as directed to defendant's counterclaim, because defendant did not address plaintiffs motion to dismiss the com-

plaint. If the court is lacking in subject matter jurisdiction over a claim, "the dismissal of the complaint for lack of jurisdiction carries with it the dismissal of any counterclaim filed in the matter by the United States." *Joseph Morton Co. v. United States*, 3 Cl.Ct. 780, 783 (1983) (citing *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 751–52, 508 F.2d 817, 822 (1974), and *Mulholland v. United States*, 175 Ct.Cl. 832, 846, 361 F.2d 237, 245 (1966)); *see also Triton Group, Ltd. v. United States*, 10 Cl.Ct. 128, 134 (1986) (finding lack of jurisdiction over counterclaim after dismissal of complaint).

closure; requesting the same refund of the pension plan surplus, yet subject to a different interest provision under which interest accrues from the date of the alleged overfunding (CAS interest).

Defendant contends that the DACO's decision does not address the same claim, but merely is a matter related to the claim in the Air Force contracting officer's earlier decision. The Attorney General's power "does not encompass exclusive control of other matters which, albeit related, are not yet so pending." *Hughes Aircraft*, 209 Ct.Cl. at 465, 534 F.2d at 901. Defendant contends that because "the Government's claim in [the 612 action] requests CAS interest from the date of noncompliance, something which the United States is not entitled to under the non-CAS contract bases for recovery asserted in [the 357 action]," and, further, that because "only the DACO was authorized to issue a demand under the CAS ... and contract clause J.33 could not and did not implicate CAS 413,"[5] the DACO was within her authority to issue a second final decision.[6] Def's Br. filed Nov. 12, 1998, at 12.

Defendant also submitted the *post hoc* declarations of DACO Margaret E. Gilmour, who issued the April 9, 1998 decision, and Supervisory Contract Specialist and Contracting Officer Susan A. Crockett, who issued the March 5, 1997 decision, for the purpose of demonstrating that the Government's enforcement of its rights under CAS 413 and under clause J.33 required "separate and distinct analyses and processes, and resulted in Government claims for significantly different amounts." Def's Br. filed Feb. 25, 1999, at 2. Defendant notes that the DACO was required to calculate the amount of overpayment into the pension find and the appropriate interest on the CAS noncompliance— interest that was not a component of the Air Force's claim based on clause J.33. In addition, prior to a final decision regarding compliance with CAS 413, defendant points out that the DACO must provide the contractor with initial and final determinations of noncompliance and thereafter allow the contractor an appropriate period in which to respond; in contrast, the Air Force contracting officer was not required to issue preliminary findings of non-compliance with clause J.33 before issuing a final decision.

 Two claims are the same if each alleges the same entitlement to the same amount based on the same triggering events, even if each is asserted under a different legal label. *See Sharman*, 2 F.3d at 1571. It is undisputed that only the DACO, and not the Air Force contracting officer, had the requisite authority to render findings on CAS noncompliance and request CAS interest running from the date of the overfunding or the segment closure date.[7] It is also undis-

---

5. The court notes that Special Provision J.33 directs the contractor to "submit to the Contracting Officer a statement of this segment's actuarially determined liability and plan assets as computed in accordance with the provisions of [Cost Accounting Standard] 413." Neither plaintiff nor defendant considered whether the Air Force contracting officer retained authority to issue a final decision based on a contract clause directing the contractor to submit a statement in accordance with the CAS.

6. Defendant also contends that the two final decisions are distinct because "the Government's claim in [the 357 action] for the United States's share of [plaintiff's] reversionary credits is calculated in a different manner based on the time when [plaintiff] received the credits, not the time when [plaintiff] received the credits, not the time when the segment closed, and will likely result in a different quantum of recovery than calculation based on segment closure, and will not entitle the Government to CAS interest...." Def's Br. filed Nov. 12, 1998, at 12. Plaintiff does not dispute that the Air Force contracting officer's claim for

reversionary credits is unrelated to the claim for surplus pension assets. That the Air Force contracting officer's decision asserted a claim for the recovery of reversionary credits, in addition to the claim for the recovery of surplus pension assets, does not bear upon whether the latter claim is the same claim as that asserted by the DACO's final decision. For the purpose of determining whether a subsequent claim is barred by *Sharman*, multiple claims asserting distinct quantums within the same case may be analyzed separately. *See Volmar Constr., Inc. v. United States*, 32 Fed. Cl. 746, 752 (1995).

7. Both plaintiff and defendant acknowledge *McDonnell Douglas Corp.*, 93–2 BCA ¶ 25,700 at 127,856 for the proposition that, under the Defense Acquisition Regulation and the Federal Acquisition Regulation, the DACO has exclusive authority over CAS non-compliance determinations and that such authority cannot "be retained by or delegated back to the [agency contracting officer]."

puted that CAS interest under ASPR 7–104.83(a)(5) accrues from the date of noncompliance and that contract interest under ASPR 7–104.39 accrues from the date of written demand. These factual and legal distinctions notwithstanding, both final decisions request a refund of approximately the same amount, $56 million in pension surplus, based on the same triggering event, the segment closure, and plaintiff's alleged failure to conduct the asset versus liability assessment in response thereto. Defendant admitted as much in stating:

> The United States acknowledges that its affirmative government claim in [the 357 action] under Clause J.33 and its CAS 413 claim in [the 612 action] demand the same surplus of the same pension funds because both claims rely on the same closing date as the triggering event for the required accounting.

Def's Br. filed Nov. 12, 1998, at 13–14.

Defendant's contention that analyses and processes leading to each final decision were "separate and distinct," Def's Br. filed Feb. 25, 1999, at 2, is belied by the declarations executed by the DACO and the Air Force contracting officer. In accordance with the relevant provisions of the Federal Acquisition Regulation (the "FAR") and the Defense Acquisition Regulation (the "DAR"), prior to issuing a final decision, the DACO issued an Initial Determination of Noncompliance with CAS 413 on March 1, 1996, and a final Determination of Noncompliance on May 21, 1997, thereby allowing plaintiff to respond, and engaging in negotiation when necessary. *See* Decl. of Margaret E. Gilmour, Feb. 19, 1999, ¶¶ 5–13. Although neither the FAR nor the DAR requires a similar determination of noncompliance with clause J.33 before rendering a final decision, the Air Force contracting officer's declaration indicates that the Defense Contract Audit Agency (the "DCAA") issued several audit reports addressing plaintiff's failure to comply with clauses J.33 in the 1978 ETR Contract and H.871 in the 1984 ETR contract prior to the date of her final decision; she also states that plaintiff and the Air Force attended at least two meetings two discuss plaintiff's responsibilities under clause J.33. *See* Decl. of Susan

A. Crockett, Feb. 18, 1999, ¶¶ 5–7. Regardless of the similarities or differences in the statutory or regulatory processes that must precede a final decision of noncompliance under the CAS or clause J.33, the test enunciated in *Sharman* does not recognize these processes as significant. Contrary to defendant's implication that the different processes distinguish the two final decisions, plaintiff and the Air Force were engaged in discussions, negotiations, and the exchange of correspondence, beginning as early as 1991, for the sole purpose of settling the Air Force's claim to recover the pension surplus. Defendant has not demonstrated other than negligible significance of the fact that the first final decision was styled as a J.33 claim and that the second was styled as a CAS 413 claim, considering that both claims seek the same amount based on the same underlying events.

*Case,* on which defendant relies, is readily distinguishable. The court in *Case* confronted two claims markedly different from one another. The first alleged damages based on an unreasonable delivery schedule. The second claim alleged entitlement to money based on an unduly restrictive government inspection and defective specifications; the second claim also sought recovery for lost profits. *See Case,* 88 F.3d at 1010. The court distinguished *Sharman,* concluding that the two claims were not the "mirror image" of one another, despite the fact that both "arose out of the same underlying set of facts and involved allegations of defective specifications...." *Id.* Unlike the final decisions underlying the instant dispute, each claim in *Case* (1) sought a different amount (2) based on a different triggering event.

The determinative issue thus is whether the two final decisions seeking a refund of the same surplus pension assets are the same despite the different interest calculations. Defendant contends that, unlike the claim under clause J.33, which is "limited to the pension surplus due under the clause," the claim submitted by the DACO under CAS 413 "is a sum certain that includes both the overpayment and CAS interest" Def's Br. filed Feb. 25, 1999, at 4. Defendant relies upon the applicable interest provisions of the

DAR and the FAR in support of the contention that CAS interest is an "essential component," *id.*, of a contract price adjustment arising out of CAS noncompliance.[8] Because the FAR and the DAR contemplate a separate, specific identification and assertion of the CAS interest, defendant argues that CAS interest is a substantive and distinct liability. Distilled to its essence, defendant's position is that (1) unlike the DACO's final decision that demanded the surplus amount and CAS interest, interest was not a component of the amount demanded by the Air Force in its claim under clause J.33; and (2) to the extent that interest is contemplated by the claim under J.33, it did not begin to run until after the Air Force contracting officer's final decision on March 5, 1997, whereas CAS interest began accruing on October 1, 1988.[9]

Defendant contends: "Arguably, the Government would have lost its right to CAS interest had the [DACO] not demanded CAS interest separately and as part of her final decision." Def's Br. filed Feb. 25, 1999, at 4. This is not the case. The amendments to the Defense Production Act of 1950, Pub.L. No. 91–379, 103, 84 Stat. 798 (1970), in effect when the subject contracts were executed, provide:

> [The CAS] regulations shall require defense contractors and subcontractors . . . to agree to a contract price adjustment, *with interest,* for any increased costs paid to the defense contractor by the United States because of the defense contractor's failure to comply with duly promulgated costs accounting standards. . . . *Such in-*

*terest shall [accrue] from the time such payments were made to the contractor or subcontractor to the time such price adjustment is effected.*

(Emphasis added.) In compliance with this statute, the CAS Board promulgated regulations requiring the payment of interest as part of the Government's recovery from the contractor arising from a CAS violation. *See* 4 C.F.R. 331.50(a)(5) (1978) (Adjustments "shall provide for recovery of the increased costs to the United States together with interest thereon . . . from the time payment by the United States was made to the time the adjustment is effected.").

Even though defendant argues that interest was not a component of the J.33 claim,[10] interest does not constitute an independent claim for recovery.

> Once the amounts for the underlying claims are set, the determination of . . . interest is objective, legal, and mathematical, not lending itself to certification nor serving any of certification's fraud-preventive goals. It would be needless, redundant and overly-technical to require certification of that interest claim.

*Brookfield Constr. Co. v. United States,* 228 Ct.Cl. 551, 562, 661 F.2d 159, 167 (1981); *see also Amplitronics, Inc.,* 94–2 BCA ¶ 26,8567 at 133,631 (concluding that interest under CDA is not a separate, certifiable claim). The record is clear that each final decision seeks the same surplus pension assets based on plaintiff's failure to conduct an adequate asset versus liability assessment following

---

8. DAR 7–183(a)(1), Cost Accounting Standards (1978 MAY), states, in part, that "[s]uch adjustments shall provide for the recovery of the increased costs to the United States, together with interest thereon computed . . . from the time payment by the United States was made to the time the adjustment is effected." Similarly, FAR 30.602–2(c)(2) provides, in pertinent part:

> [T]he ACO shall include and separately identify, as part of the contract price adjustment(s), applicable interest on any increased costs paid to the contractor as a result of the noncompliance. Interest shall be computed from the date of overpayment to the time the adjustment is affected.

9. Defendant states: "[T]he Government's entitlement to interest under its claim in [the 357

action] based upon the credits clauses and contract clause J.33 would only begin to run from the date of the first written demand for payment consistent with the contract." Def's Br. filed Nov. 12, 1998, at 15. However, defendant's counterclaim in the 357 action avers that, in addition to the "$54,923,068 for its failure to comply with ETR contract clause J.33," Def's Ans. to 357 Action, filed Dec. 9, 1997, ¶ 283, plaintiff is liable to the Air Force, "for interest accruing from the date of its noncompliance to the present time." *Id.*

10. Plaintiff disputes vigorously any implication by defendant that interest is not a component of the Air Force's claim under clause J.33. Plaintiff is correct insofar as interest is recoverable under both claims, the critical difference being the date from which interest begins to accrue.

**514**

the alleged segment closure, although the second decision invoked an interest provision far more favorable to the Air Force than the first. A claim is defined as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. . . ." *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir. 1995) (citing FAR 33.201, 48 C.F.R. 33.201). Both final decisions demand the same sum certain, approximately $56 million. *Brookfield Construction* instructs that, even if each claim considers a different interest calculation, the difference in potential recovery is insufficient to distinguish the two under the doctrine enunciated in *Sharman.* Each final decision is equally certain regarding the amount of the underlying quantum and equally uncertain, to the extent that the amount of interest due cannot be calculated precisely until the date plaintiff's claim is resolved judicially.

The court is not unmoved by the amount of interest—almost $23 million—that the Government will forfeit if defendant's counterclaim is dismissed. Although the interest demanded pursuant to the CAS provision is sizeable, it does not follow that interest should be certified as a separate claim and considered a substantive and distinct liability. For 20 years the Department of Justice has been punctilious about enforcing any provision of the CDA that calls for a narrow construction, and plaintiff's motion calls for no more than equal treatment for a contractor defending against a government claim.

Ultimately, the Air Force could have avoided the jurisdictional defect in its counterclaim by simply coordinating its efforts. Nothing in the record suggests that the DACO and the Air Force contracting officer were precluded from issuing a joint decision, simultaneous decisions, or decisions in such temporal proximity that plaintiff effectively would have been foreclosed from appealing to this court the first decision before the second decision issued. Indeed, the minutes of a DCAA meeting attended by both Mmes.

Gilmour and Crockett, dated May 9, 1995, recite:

> Lines of authority and jurisdiction are of concern as Sue Crockett cannot resolve CAS issues. The contractor points this out in their letter of 4 Apr. 1995. . . . As it is assumed that [plaintiff] will want to resolve the over funding of the pension plan as well as the noncompliance in one action, the two ACOs will have to work in consonance. It is anticipated that two separate final decisions will be submitted simultaneously.

Plaintiff is correct in noting that "[i]f differing interest [were] enough to differentiate two claims, a party could circumvent DOJ's exclusive jurisdiction and the *Sharman* doctrine simply by manipulating the timing of its claims." Plf's Br. filed Dec. 7, 1998, at 8 n. 8; *see Volmar Constr.,* 32 Fed.Cl. at 761 (requiring issuance of final decisions in such manner to avoid piecemeal litigation). That the cognizant parties were on notice of the need to coordinate the timing of the decisions further underscores why defendant cannot cure *post hoc* the jurisdictional defect in its counterclaim.

## CONCLUSION

Based on the foregoing, plaintiff's motion to dismiss defendant's counterclaim for lack of subject natter jurisdiction is granted. Accordingly,

**IT IS ORDERED,** as follows:

1. By May 8, 1999, plaintiff may move to dismiss its complaint if it considers that this opinion resolves all matters claimed therein. If such a motion is filed, the court will dismiss the complaint for lack of jurisdiction, noting defendant's opposition.[11]

2. Paragraph 1 of the order entered on January 25, 1999, remains in effect.

---

11. *See supra* note 4.