**JOHNSON CONTROLS WORLD SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–357C.**

United States Court of Federal Claims.

Nov. 8, 2000.

Dale H. Oliver, Los Angeles, CA, for plaintiff. Paul E. Pompeo, Vice President and General Counsel, Johnson Controls World Services, Inc., Cape Canaveral, FL, and Roger N. Boyd, Terry L. Albertson, and Linda S. Bruggeman, Crowell & Moring, Washington, DC, of counsel.

William W. Steward, Washington, DC, with whom was Assistant Attorney General David W. Ogden, for defendant. Maj. Rebecca E. Pearson, United States Air Force Legal Services, of counsel. Terry M. Petrie, Department of Justice, on the brief.

### ORDER

MILLER, Judge.

This matter is before the court on Plaintiff's Motion for Summary Judgment and Confession of Judgment. As the result of a pension fund close-out, to which the United States had contributed, the Government became entitled to any excess over the pension fund costs. Ascertainment of the excess was to be the product of agreement. Failing agreement, the matter was to be resolved as a dispute under the contract. At issue is whether the valuation report submitted by plaintiff is sufficient to establish the amount

of the surplus due to the Government. Argument is deemed unnecessary.

## FACTS

Prior to filing its pending motion for partial summary judgment, Johnson Controls World Services, Inc. ("plaintiff"), submitted two motions to dismiss on December 23, 1998, and January 29, 1999, respectively, which generated extensive factual findings. *See Johnson Controls World Servs., Inc. v. United States*, 44 Fed.Cl. 334 (1999) (order denying plaintiff's motion to dismiss because plaintiff was transferee of subject contract to which pension funds related, as well as assets thereof); *Johnson Controls World Servs., Inc. v. United States*, 43 Fed.Cl. 589 (1999) (allowing government to pursue counterclaim for pension assets as result of overbilling and overfunding). Only those facts bearing on the instant motion are repeated.[1]

The surplus pension funds at issue relate to two in a series of contracts dating back to 1953 initially between the United States Air Force and Pan American World Airways ("Airways") for the performance of maintenance and operation services on the Eastern Test Range (the "ETR") in Cape Canaveral, Florida. Through 1977 Airways charged to the various ETR contracts the costs of its Cooperative Retirement Income Plan ("CRIP"), a defined-benefit pension plan, for pension costs attributable to Airways employees working on the ETR. On September 17, 1977, the Air Force and Airways executed Contract No. F08606–78–C–0004 (the "1978 ETR contract"). The Aerospace Services Division ("ASD") of Airways performed the 1978 ETR contract. In 1979 ASD, including all of its assets associated with the performance of the 1978 ETR contract, was transferred from Airways to Pan American World Services ("PAWS"), a 100%-owned subsidiary of Airways.[2] Airways and PAWS charged approximately $14.9 million in pension costs to the 1978 ETR contract attributable to CRIP and to the Cooperative Retirement Income Plan for the Aerospace Services Division ("CRIP/ASD").[3]

Upon the termination of the 1978 ETR contract, the Air Force and PAWS executed follow-on Contract No. F08606–84–C–0001 (the "1984 ETR contract") for the performance of support services on the ETR. In May 1989 Johnson Controls, Inc., purchased the stock of PAWS from Pan Am Corporation, which was created in September 1984 as a holding company with Airways and PAWS as subsidiaries. In January 1991 PAWS changed its name to Johnson Controls World Services, Inc.

Special provision J.33 of the 1978 ETR contract stated:

> a. It is recognized that the contractor's pension plain is not presently fully funded. The unfunded liability is being amortized consistent with the provisions of the Employee Retirement Income Security Act of 1974, applicable Internal Revenue Service

---

**1.** This case is the companion to *Johnson Controls World Servs., Inc. v. United States*, 43 Fed.Cl. 506 (1999), which shares some of the same operative facts as those discussed herein. On April 28, 1999, the court granted plaintiff's partial motion to dismiss in that action. *See id.* at 514 (holding that concurrent jurisdiction could not be retained over two claims requesting same underlying quantum, based on same events, and distinguished only by different clauses under which interest due was calculated).

**2.** After a series of business reorganizations, corporate name changes, and asset transfers, plaintiff effectively succeeded PAWS as the contractor for the 1978 ETR contract. This point was in dispute until the court entered its June 18, 1999 opinion by which it denied plaintiff's motion to dismiss for lack of subject matter jurisdiction with respect to plaintiff's assertions that (1) plaintiff was not the contractor under the 1978 ETR contract, and (2) neither the Government nor Airways assigned or transferred the 1978 ETR contract to PAWS or plaintiff. *See Johnson Controls World Servs. v. United States*, 44 Fed.Cl. 334 (1999).

**3.** CRIP/ASD was established by Airways as a separate pension plan for ASD employees, effective January 1, 1979. Like CRIP, CRIP/ASD was a defined-benefit pension plan created for employees participating in CRIP working on government contracts, including all Airways employees working directly on ETR contracts. Airways established CRIP/ASD for the purpose of facilitating separate accounting of pension costs to contracts with the United States from the commercial work of Airways. On October 1, 1985, Airways renamed CRIP/ASD as Pan Am World Services Cooperative Retirement Income Plan ("WS/CRIP") and transferred sponsorship of WS/CRIP to PAWS.

Regulation, and the contractor's usual practices for funding such liabilities. The estimated cost of this contract does not include any amount for the unfunded liability for other than the period under contract.

b. If as a result of final close-out of this contract or any follow-on contracts, whichever occurs later, the contractor's segment is closed, the contractor shall submit to the Contracting Officer a statement of this segment's actuarially determined liability and plan assets as computed in accordance with the provisions of [Cost Accounting Standard] 413.[4]

c. Pension fund adjustments will be determined in accordance with DAR Section 15, Part 2. Upon receipt of such statement and supporting documentation, the Contracting Officer, after audit review, shall negotiate with the contractor the amount considered as the fund deficit or excess. The difference between the market value of the assets and the actuarial liability for the segment will be considered as an adjustment to previously determined pension costs.

d. Any adjustment due to a deficit shall be treated as an allowable reimbursable (out-of-target) cost under General Provision 3 and General Provision 4. In such event, an adjustment to the estimated cost of this contract shall be negotiated. That portion of any excess applicable to this contract shall be applied in reduction of any payment to be made by the Government under this contract or will otherwise be credited or paid by such other means as the Contracting Officer may direct.

e. Failure to agree upon the amount of payment or repayment shall be treated as a dispute within the meaning of the clause entitled "Disputes" of the General Provisions.

The 1978 ETR contract incorporated by reference the pertinent clauses of the Armed Service Procurement Regulations ("ASPR") requiring the contractor's compliance with all applicable Cost Accounting Standards ("CAS"). Among these clauses, ASPR 7–104.83(a)(5), stated that the contractor shall

[a]gree to an adjustment of the contract price or cost allowance, as appropriate, if he or a subcontractor fails to comply with an applicable Cost Accounting Standard ... and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States together with interest thereon computed at a rate determined by the Secretary of the Treasury pursuant to Public Law 92–41, 85 STAT. 97, or seven percent (7%) per annum, whichever is less, from the time payment by the United States was made to the time the adjustment is effected.

The 1978 ETR contract also incorporated by reference ASPR 7–104.39, Interest. This clause permitted interest to accrue from "the date of the first written demand for payment" on "all amounts that become payable by the Contractor to the Government under this contract," unless paid within 30 days from the date due. As a "follow-on" contract to the 1978 ETR contract, the 1984 ETR contract continued subject to the J.33 clause and the requirements of the CAS.[5] The 1984 ETR contract also incorporated by reference updated versions of ASPR 7–104.83(a)(5) and ASPR 7–104.39, in a form virtually identical to their predecessors.

Performance under the ETR contracts was completed on September 30, 1988. Between

---

4. CAS 413(c)(12) provides:

If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated.... The difference between the market value of the assets and the actuarial liability for the segment represents an adjustment of previously-determined pension costs.

5. Although the *1984 ETR contract did not contain Special Provision J.33, Special Provision H.871 stated:*

The proposed change between Defined Benefits Plan and Defined Contribution Plan is subject to subsequent review in accordance with cost principles in effect as of the date of this contract. This review will include consideration of any entitlement for cost or credits to the Government in accordance with the Cost Principles and other terms and conditions of this contract.

November 1991 and November 1992, plaintiff terminated and cashed out its pension plan under the ETR contracts, receiving a gross reversion of $49,618,599.00. In addition, plaintiff received approximately $2,037,683.00 in mortality credits under participating insurance contracts retained by plaintiff's predecessor in interest.

## DISCUSSION

### 1. Standard of review

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson* at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1), a trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson* at 255, 106 S.Ct. 2505.

For the purposes of its motion, plaintiff has stipulated that the ETR project was a segment within the meaning of clause J.33 and CAS 413 and that the segment was closed on October 1, 1988. Pursuant to these stipulations, plaintiff now submits a valuation of the pension fund surplus, as required by clause J.33. The substance of plaintiff's motion is devoted to a calculation and explanation of its "actuarially determined liability and plan assets as computed in accordance with the provisions of CAS 413." *See* ETR Contract, J.33(b).

Defendant agrees that the segment was closed on October 1, 1988, and that contract clause J.33 governs the amount of the Government's recovery. Defendant opposes plaintiff's motion on the ground that plaintiff's calculation of the value of the plan surplus as of the date of segment closure is flawed.

The starting point for plaintiff's calculation of the pension fund surplus is a valuation prepared by its actuary, Godwins, Inc. This valuation purports to show the value of the WS/PPG[6] pension plan as of October 1, 1988. The Godwin valuation asserts that the plan had a market value of assets of $90,815,386.00 and liabilities of $66,537,-573.00, resulting in a surplus of $24,277,-813.00. Based on this amount, plaintiff proceeds through a variety of additions and deductions, arriving at a final pension fund surplus amount.

First, plaintiff carves out that part of the pension fund it claims is attributable to non-ETR segments. Plaintiff accepts the Government's assertion that 95.38% of the total contributions to the pension plan was attributable to the ETR segment, resulting in an ETR excess of $23,156,178.00.

Next, plaintiff takes the position that an "adjustment must be made to account for the amount of employee contributions made to the plan." Pl.'s Br. filed May 26, 2000, at 10. Citing a number of Board of Contract Appeals cases, plaintiff asserts that the Government is "not entitled to a credit for the share of the surplus corresponding to the percentage of the premiums paid by employees." *Id.* at 14. Using calculations obtained from summaries of contemporaneous records maintained during the plan's existence, plaintiff arrives at 20.55% as the amount of employee contributions to the plan. Multiplying this percentage by the portion of surplus attributable to the ETR contract ($23,156,-178.00) results in a figure of $4,758,594.00. Deducting this amount results in an ETR excess of $18,409,161.00.

Plaintiff then argues that it is entitled to an adjustment of $121,811.85 because the

---

**6.** WS/PPG was the fund that covered Airways employees who worked on Government contracts. This fund originally was created in September 1987 and then was merged with WS/ CRIP in October 1987, retaining the name WS/ PPG. Defendant disputes the validity of this merger.

Government has withheld this amount from the 1978 ETR Contract. After this adjustment the pension fund surplus is $18,287,-349.15.

Plaintiff does allow that the Government is entitled to interest on this amount from March 5, 1997. The Government's right to interest is governed by ASPR 7–104.39, Interest, which is incorporated by reference into the 1978 ETR Contract. Under ASPR 7–104.39, interest accrues at the Treasury rate from the date of written demand by the Government—in this case on March 5, 1997.

Thus, through various adjustments, plaintiff arrives at $18,287,349.15, plus interest as the total pension fund surplus amount due to the Government.[7]

### 2. *The parties' valuations of the pension fund surplus*

■ Defendant disputes plaintiff's valuation on one simple and other more complex grounds. Primarily, defendant asserts that it cannot ascertain how plaintiff arrived at the valuation of the pension fund surplus. Defendant states that it "can have no confidence in the figures put forth by plaintiff" and requests discovery to determine the "nature, identity, and value of plan assets" and to determine whether plaintiff "ever performed an actuarial valuation of the plan's liabilities." Def.'s Br. filed Aug. 11, 2000, at 25. Additionally, defendant attacks the mechanics of plaintiff's calculations.

Defendant's argument is forceful in light of the purposes of summary judgment. The party moving for summary judgment must show an entitlement to summary judgment under RCFC 56(c). This party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (1986); *see also Assets Service Corp. v. United States,* 121 Ct.Cl. 308, 1952 WL 5929 (1952) (burden of showing the absence of genuine issue of material fact which would justify granting summary judgment is upon party asking for summary judgment). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987).

Plaintiff's motion discloses significant issues of fact which preclude summary judgment. Plaintiff has not demonstrated that it completed a "actuarially determined" calculation of liability and assets (as required by J.33) merely by submitting a valuation performed by an actuarial firm. To the contrary, the Godwin valuation actually masks many of the calculations and does not allow the court to determine whether plaintiff complied with J.33 and CAS 413. This deficiency alone is sufficient to deny summary judgment and permit discovery to determine the assets and liabilities of the pension surplus fund.

Other material issues of fact impact the pension fund surplus amount. For example, defendant vehemently contests whether the merger of the WS/CRIP and WS/PPG funds was valid. This issue turns on what knowledge the Government had when the merger was approved by Contracting Officer Robert Tavalli and cannot be resolved without further fact development.

Defendant makes further arguments relating to whether the interest rate assumptions made by the Godwin firm are defensible, whether government contributions were deposited into the fund, whether erroneous employee data were used, and whether amounts withheld by the Government from the 1978 ETR contract should be offset, among others. These arguments involve disputed issues of material fact.

■ The parties also disagree as to whether employee contributions should be offset against the Government's recovery. Plaintiff argues that "[t]he Government is not entitled to recover pension fund amounts attributable to employee contributions because the employee contributions were not a cost paid by the Government." Pl.'s Br. filed May 26, 2000, at 10. Plaintiff cites *California Institute of Technology,* 69–1 BCA ¶ 7,624, *aff'd on recons.,* 69–2 BCA ¶ 7,892, and *RMK–*

---

7. The first and last pages of plaintiff's May 26, 2000 motion list the amount due to the Government as $18,275,772.15. Because plaintiff's filings do not explain all the steps plaintiff took to arrive at this figure, the court cannot validate it.

*BRJ, A Joint Venture,* 74-1 BCA ¶ 10,535, for the proposition that the Government's refund is "limited to that portion of the income that relates to allowable costs, *i.e.,* by the amount of cost actually charged to the Government by the contractor." Pl.'s Br. filed May 26, 2000, at 10. These two cases are inapposite, however, because both involved refunds governed by contract provisions that expressly conditioned the Government's entitlement to a refund on having paid the costs to which the refund was applicable. No such contractual stipulation is present in this case. Instead, J.33 requires that the "portion of any excess applicable to this contract shall be ... paid ... as the Contracting Officer may direct." Thus, in calculating the fund surplus, employee contributions should not be offset against the Government's recovery.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED** as follows,

1. Plaintiff's motion for summary judgment is denied.

2. The scheduling order entered on February 9, 2000, remains in effect.